# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>1023 Joe Matthews Road,<br>Sanford, North Carolina 27332 | )<br>)<br>)<br>)<br>)<br>) |

Case No. 1:22MJ **210**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A1

located in the _____ Middle _____ District of _____ North Carolina _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 111(a)(1) & (b) | Assaulting Certain Officers |
| 18 U.S.C. 231(a)(3) | Civil Disorder |
| 18 U.S.C. 1752(a) | Trespass/Disorderly Conduct/Physical Violence in Restricted Building or Grounds |

The application is based on these facts:

See Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/S/ Craig Noyes
*Applicant's signature*

Craig Noyes, Special Agent, FBI
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: **5/9/2022**

_____
*Judge's signature*

City and state: Winston-Salem, North Carolina

The Honorable Joi E. Peake, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for warrants to search: 1) the premises known as 1023 Joe Matthews Road, Sanford, North Carolina 27332, in the Middle District of North Carolina (the "SUBJECT PREMISES"), further described in Attachment A-1; and 2) the person of DAVID GIETZEN, including any bag or backpack carried with him, further described in Attachment A-2, for the things described in Attachment B.  Both the SUBJECT PREMISES and GIETZEN are located in the Middle District of North Carolina.  Both search warrants would authorize the seizure of certain mobile cellular telephones belonging to DAVID GIETZEN ("SUBJECT DEVICES," as defined further below).

2.     I, Craig Noyes, am a Special Agent of the Federal Bureau of Investigation, currently assigned to the Joint Terrorism Task Force in the Raleigh Resident Agency.  In my duties as a Special Agent, I am authorized by law or by a government agency to engage in or supervise the prevention, detention, investigation, or prosecution of a violation of Federal criminal laws.  Currently, I am tasked with investigating criminal activity in and around the Capitol grounds on January 6, 2021.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

4.     Based on the facts set forth in this affidavit, there is probable cause to believe that DAVID GIETZEN (and other identified and unidentified persons) have violated 18 U.S.C. § 111(a)(1) & (b) (Assaulting, Resisting, or Impeding Certain Officers with Deadly or Dangerous

Weapon), 18 U.S.C. § 231(a)(3) (Civil Disorder), 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds), 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds), and 18 U.S.C. § 1752(a)(4) (Engaging in Physical Violence in a Restricted Building or Grounds) (collectively, the "Target Offenses"). As further described below, on or about April 1, 2022, a federal grand jury in the District of Columbia indicted GIETZEN, and an arrest warrant for GIETZEN has been issued related to the Target Offenses. There is also probable cause to search the SUBJECT PREMISES, further described in Attachment A-1, for the things described in Attachment B. Authority to search the SUBJECT PREMISES extends to all parts of those premises, including the main structure, garage(s), storage structures, outbuildings, and curtilage, and all vehicles, containers, compartments, or safes located on the property, whether locked or not, where the items described in Attachment B-1 could be found. Finally, there is probable cause to search the person of GIETZEN, further described in Attachment A-2, for the things described in Attachment B.

### *Background*

### *Background – The U.S. Capitol on January 6, 2021*

5.      U.S. Capitol Police (USCP), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

6.      At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres. The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point. The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol. On the

west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor. On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway. All of this area was barricaded and off limits to the public on January 6, 2021.

7.     The U.S. Capitol is secured 24 hours a day by USCP. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

8.     On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

9.     On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification"). The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST). Shortly thereafter, by approximately 1:30 p.m. EST, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

10.     As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the

Case 1:22-mj-00210-JEP   Document 1   Filed 05/09/22   Page 4 of 52

exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

11.     At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

12.     At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby. Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

13.     Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence." I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

14.     At approximately 2:00 p.m. EST, some people in the crowd forced their way through, up, and over the barricades and law enforcement. The crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials. At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

15.     Shortly after 2:00 p.m. EST, individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others

4

in the crowd encouraged and assisted those acts. Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



16. Shortly thereafter, at approximately 2:20 p.m. EST, members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down. USCP ordered a similar lockdown in the House chamber. As the subjects attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

17. At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building. Once inside, the subjects broke windows

and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured and several were admitted to the hospital. The subjects also confronted and terrorized members of Congress, Congressional staff, and the media. The subjects carried weapons including tire irons, sledgehammers, bear spray, and tasers. They also took police equipment from overrun police including shields and police batons. At least one of the subjects carried a handgun with an extended magazine. These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

18. Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

19. At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

20. At around 2:47 p.m. EST, subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber. Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



21.     After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?" Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



22.     One subject left a note on the podium on the floor of the Senate Chamber.  This note, captured by the filming reporter, stated "A Matter of Time Justice is Coming."



23.     During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the U.S. Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs.  Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals are expected to be taken into custody.





24.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m. EST.

25.    At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

26.    At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

27.    Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

28.    Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. EST the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

29.    Beginning around 8:00 p.m. EST, the Senate resumed work on the Certification.

30.    Beginning around 9:00 p.m. EST, the House resumed work on the Certification.

31.    Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3:00 a.m. EST on January 7, 2021.

32.    During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

10

33.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

34.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

35.     Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:

Case 1:22-mj-00210-JEP   Document 1   Filed 05/09/22   Page 12 of 52



---

[1]    https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/





### *Conduct of DAVID JOSEPH GIETZEN*
### Identification of GIETZEN

36.     The FBI Washington Field Office published multiple photographs on the FBI website (www.fbi.gov) of participants in the riot at the U.S. Capitol Building on January 6, 2021, seeking to identify those pictured. Each individual pictured was assigned a number to aid in identification, to include Photograph #217 - AFO (Exhibit 1).

<u>**Exhibit 1**</u>



37.     On or about February 14, 2021, a tipster (TIPSTER 1) contacted the FBI and identified the individual pictured in Photograph #217 as David Joseph Gietzen (GIETZEN), residing in Raleigh, NC. TIPSTER 1 also provided a screenshot of GIETZEN's Facebook page and reported that the picture of GIETZEN on the Facebook profile was old and he had grown his hair out since the picture. TIPSTER 1 knew GIETZEN through a friend's family member and from the attending the same college as GIETZEN. On or about July 20, 2021, TIPSTER 1 was interviewed by law enforcement and described meeting GIETZEN through mutual friends several years ago while attending college. TIPSTER 1 described their relationship as acquaintances and not close friends who saw each other occasionally on campus and at off campus parties. After the riot at the U.S. Capitol building on January 6, 2021, TIPSTER 1 visited the website Reddit and scrolled through the pictures of wanted FBI subjects and saw AFO #217 and thought it matched

GIETZEN. TIPSTER 1 consulted with another person who knows GIETZEN, and they both agreed #217 was GIETZEN. TIPSTER 1 subsequently submitted the tip to the FBI. The person TIPSTER 1 consulted also submitted a tip to the FBI but requested to stay anonymous. This person will be referred to as TIPSTER 2.

38.     On or about May 27, 2021, law enforcement interviewed TIPSTER 2 and TIPSTER 2 provided photographs from a group text message indicating that GIETZEN participated in the U.S. Capitol riot. TIPSTER 2 provided the below picture of GIETZEN on January 6, 2021. GIETZEN appears to be wearing a green jacket, blue jeans, knee pads and dark shoes, and to have shoulder length brown hair, a short beard, and a mustache (Exhibit 2):

**Exhibit 2**



39.     After reviewing the photograph of AFO #217, TIPSTER 2 stated AFO #217 appeared to be GIETZEN, although TIPSTER 2 could not say with 100% certainty since TIPSTER 2 had not seen GIETZEN in a few years.

40.     TIPSTER 3, an individual personally familiar with GIETZEN, was shown the photos in Exhibit 1 and Exhibit 2, and said that both were "definitely" GIETZEN.  TIPSTER 3 specifically recognized the green jacket in Exhibit 2 as belonging to GIETZEN.

41.     On January 16, 2021, the FBI received a report about text messages in which GIETZEN and his brother indicated that they wanted to meet others at the U.S. Capitol on January 20, 2021, for the presidential inauguration.  The report stated that their plan was to force their way

Case 1:22-mj-00210-JEP   Document 1   Filed 05/09/22   Page 17 of 52

in the Capitol building to force Congress to hold another election, and that the Gietzen brothers were also at the U.S. Capitol riot on January 6, 2021.

42.     In response to that report, the FBI attempted to locate GIETZEN. Contact was made with GIETZEN's sister at the SUBJECT PREMISES on January 19, 2021. GIETZEN's sister advised that both GIETZEN and his brother lived at the SUBJECT PREMISES but were not home at the time. The sister advised that a 2006 Ford Focus, bearing N.C. license plate HEN8570 (expired on 2/15/2022), VIN: 1FAFP34N16W236942, registered to GIETZEN and parked in the driveway at the time, had been given to her but that she had not registered it in her name. GIETZEN was then telephonically interviewed by the FBI on January 19, 2021.

43.     On or about January 19, 2021, GIETZEN was contacted by phone by the FBI and agreed to speak to agents. GIETZEN stated that he and his brother were en route to Washington D.C. to attend the presidential inauguration and that he had no intentions of committing any acts of violence. He stated that on January 6, 2021, he and his brother had attended the protest in Washington, D.C. He stated that while walking to the Capitol, the situation escalated because protesters believed the police were trying to stop them from continuing to the Capitol. GIETZEN said that he and his brother never made it to the Capitol.

44.     I reviewed Body Worn Camera ("BWC") footage obtained from multiple D.C. Metropolitan Police Department ("MPD") Officers who were present during the riot on January 6, 2021. I also reviewed Closed Caption Television (CCTV) footage and open source video footage from outside the U.S. Capitol Building on January 6, 2021. During my review of these cameras and videos, I observed the individual pictured in Photographs #217 on numerous occasions in footage on the U.S. Capitol grounds. Based on the similarity in appearance and attire of the individual in this footage to the pictures provided by TIPSTER #1 and 2, as well as the statements

17

made by TIPSTER #1 as detailed above, and a comparison of GIETZEN's most recent driver's license photograph, I believe the individual pictured in Photographs #217, as well as the individual pictured in the screenshots below, to be GIETZEN.

## Conduct of GIETZEN on the Grounds of the U.S. Capitol

45.     As stated above, GIETZEN is captured on numerous MPD Officers' BWCs, specifically those of MPD Officers working on the exterior West Plaza and Lower West Terrace area of the Capitol, as well as open source videos and CCTV footage during the riot. Throughout this footage, GIETZEN is seen wearing a green jacket, jeans, knee pads, and on occasion a white helmet and/or goggles. GIETZEN is seen consistently moving up and down the police line along the security gate barriers. The following are a few examples from open source materials believed to capture GIETZEN (Exhibit 3A-D):

Case 1:22-mj-00210-JEP   Document 1   Filed 05/09/22   Page 19 of 52

**Exhibit 3A[4]**

**Exhibit 3B[5]**





**Exhibit 3C[6]**

**Exhibit 3D[7]**





46.     TIPSTER 3 was shown the photos in Exhibit 3A and 3C.  TIPSTER 3 was not certain whether either photo depicted GIETZEN, but noted that the jacket in Exhibit 3A was consistent with GIETZEN's jacket.

---

[4] https://mobile.twitter.com/hashtag/greenhoodlum?src=hash; Screenshot from video post by Captain Columbo @ColumboCaptain on 03/04/2021.

[5] https://mobile.twitter.com/hashtag/greenhoodlum?src=hash; Picture posted by Sims Simon @SimsSimon15 on 03/02/2021.

[6] https://seditionhunters.org/217-afo/

[7] https://seditionhunters.org/217-afo/

**_GIETZEN Assaults Capitol Police Officers in the U.S. Capitol West Plaza Area at Approximately 2:13 pm to 2:15 pm_**

47.     An open source video from January 6, 2021 bearing the watermark "WAD Will Allen DuPraw" shows GIETZEN in the area of the security barriers in front of the West Plaza area. He is standing directly in front of the barriers, with members of law enforcement directly behind and guarding the barriers. GIETZEN is seen wearing a white helmet with a yellow emblem on the visor, a green jacket, jeans, knee pads and dark shoes. (Exhibit 4).

**Exhibit 4[8]**



48.     In the following open source photo bearing the watermark "alamy," GIETZEN is seen in approximately the same location as Exhibit 4 wearing a white helmet with a yellow emblem on the visor and a green jacket.  He appears to be pushing with the crowd against the barriers and thrusting his fist against U.S. Capitol Police officers' shields (Exhibit 5):

---

[8] https://www.dropbox.com/s/yfc4103ng9ebu6w/Will%20Allen-DuPraw%20All%20Footage%20watermarked%20part%201.mp4?dl=0 at timestamp 3:00.

**Exhibit 5**[9]



49.     Law enforcement reviewed CCTV from the Capitol grounds showing footage of the West Plaza area taken at or around 2:13 PM. The CCTV captured the incident in Exhibit 5 from another angle and shows GIETZEN, in the white helmet and a green jacket, in an altercation with law enforcement when he thrusts his fist towards officers' shields (Exhibit 6A):

---

[9] https://www.alamy.com/washington-dc-january-6-2021-pro-trump-protesters-and-police-clash-on-top-of-the-capitol-building-image396850795.html

Case 1:22-mj-00210-JEP   Document 1   Filed 05/09/22   Page 22 of 52

**Exhibit 6A**



50.     At or around 2:15 PM, GIETZEN was viewed on U.S. Capitol grounds in the same CCTV video grabbing the shield of a U.S. Capitol Police Officer. GIETZEN is identified by his white helmet and green jacket (Exhibit 6B):

**Exhibit 6B**



51.     Moments later, the same CCTV video shows GIETZEN pushing the U.S. Capitol

Police officer's shield. GIETZEN is identified by his white helmet and green jacket (Exhibit 6C):



52.     The open source video footage referenced above bearing the watermark "WAD Will Allen DuPraw" appears to capture the same incident.  The following images show GIETZEN grabbing and then pushing the officer's shield.  GIETZEN is identified by his white helmet with a yellow emblem on the visor and green jacket (Exhibits 7A-D):

**Exhibit 7A**     **Exhibit 7B**



**Exhibit 7C**     **Exhibit 7D**



### GIETZEN Assaults Officers in the U.S. Capitol West Plaza Area at Approximately 2:28 pm

53.     Law enforcement identified GIETZEN in an open source video located in the Internet Archive "WayBack Machine," a website that captures and preserves internet material available at various times on the Internet.   Notation accompanying the video indicates that it was previously posted to Parler on January 10, 2021, and based on a comparison to other videos, Agents believe that the scene below took place at approximately 2:28 pm.  In the video, GIETZEN is seen pushing an officer during a series of hand-to-hand confrontations between members of the public and MPD and Capitol Police Officers, respectively.  GIETZEN is identified by his white helmet and green jacket, blue jeans, knee pads and dark shoes (Exhibits 8A & 8B):

**Exhibit 8A**[10]



**Exhibit 8B**



---

10

https://web.archive.org/web/submit?url=https://video.parler.com/xM/8C/xM8CXfu9pQHk.mp4
at timestamp 0:20.

54.    In the same video moments later, an officer winds up surrounded by members of the crowd and GIETZEN appears to grab the officer by the throat or face mask (Exhibits 8C and 8D).

**Exhibit 8C**



**Exhibit 8D**



55.     GIETZEN is temporarily out of view in the video.  He reappears holding a long pole.  GIETZEN is identified by his white helmet, green jacket, blue jeans and knee pads (Exhibits 8E & 8F):

**Exhibit 8E**



**Exhibit 8F**



29

56. In another open source video entitled "[White hot riot] JANUARY 6 WASHINGTON, D.C. RIOT, FULL" that appears to capture the Capitol grounds at approximately the same time as the video described above from Internet Archive "WayBack Machine," but from another angle, GIETZEN is seen holding a pole and advancing to the Lower West Terrace. GIETZEN is identified by his white helmet, green jacket, goggles, shoulder-length brown hair and short brown beard and mustache:

**Exhibit 9A**[11]



57. In the video, GIETZEN walks with a crowd to a terrace area that overlooks a large number of Capitol Police Officers. GIETZEN is seen leaning forward over the railing and thrusting the pole toward the officers. His pole appears to make contact with the crowd of officers:

---

[11] https://www.youtube.com/watch?v=AQAY5hUNhWs at timestamp 25:06.

**Exhibit 9B**



**Exhibit 9C**



58.     Law Enforcement interviewed a U.S. Capitol Police officer in the video, USCP Officer 1, who witnessed the individual later identified as GIETZEN hit the officer next to him with the pole, striking him in the shoulder between his protective gear. According to USCP Officer 1, GIETZEN took the opportunity to hit the officers after the officers had to fight off a group of rioters who used a large piece of wood, appearing to be a piece of plywood the size of a door, to break through the perimeter. USCP Officer 1 identified BWC footage from Metropolitan Police Officer J.M. capturing the incident. A screenshot from the BWC of Officer J.M. at 2:31 pm is provided below in Exhibit 10.

**Exhibit 10**



59.     CCTV of the Capitol grounds at approximately 2:31 PM EST also captured the events described above from a distance (Exhibits 11A & 11B):

**Exhibit 11A**



**Exhibit 11B**



60. Law enforcement reviewed additional open source material and observed GIETZEN in the area of the Lower West Terrace tunnel in a series of videos, including one bearing the watermark "CJR III%" (Exhibits 12A & 12B). GIETZEN is identified by his green jacket, dark should-length hair and short beard and mustache, and by comparing his photo to the photo identified by TIPSTER 2, above.

**Exhibit 12A**[12]



---

[12] https://www.bitchute.com/video/Ii1cH9WLAw7x/ at timestamp 5:33.

**Exhibit 12B**



61.     GIETZEN was also observed in the area outside the Lower West Terrace Tunnel in another open source video among a crowd as the crowd thrust a flagpole toward law enforcement officers securing the West Terrace Capitol entrance (Exhibit 13):

**Exhibit 13**[13]



62.     GIETZEN was also observed on U.S. Capitol CCTV outside the Lower West Terrace Tunnel from approximately 3:57 pm to 3:58 pm pushing with the crowd back and forth against the law enforcement officers securing the entrance doorway, preventing a breach of the Capitol building (Exhibits 14A-D).  He is identified by his green jacket, dark should-length hair and short brown beard and mustache, and by comparing his photo to the photo identified by TIPSTER 2, above.

---

**Exhibit 14A**



**Exhibit 14B**



37

**Exhibit 14C**



**Exhibit 14D**



### Charges Against GIETZEN

63.     On March 25, 2022, a criminal complaint was issued by U.S. Magistrate Judge Zia

M. Faruqui, District of Columbia, charging GIETZEN with the following:

- 18 U.S.C. § 111(a)(1) & (b) - Assaulting, Resisting, or Impeding Certain Officers with Deadly or Dangerous Weapon
- 18 U.S.C. § 231(a)(3) - Civil Disorder
- 18 U.S.C. § 1752(a)(1) - Entering and Remaining in a Restricted Building or Grounds
- 18 U.S.C. § 1752(a)(2) - Disorderly and Disruptive Conduct in a Restricted Building or Grounds
- 18 U.S.C. § 1752(a)(4) - Engaging in Physical Violence in a Restricted Building or Grounds

64.     In addition, on or about April 1, 2022, a federal grand jury in the District of

Columbia indicted GIETZEN for multiple offenses, including the subject offenses. There is

currently an active arrest warrant for GIETZEN related to these charges. Both the criminal

complaint and the indictment are currently under seal and will remain so until the arrest warrant

for GIETZEN is executed.

### Facts Relating to the Subject Premises

65.     I believe the SUBJECT PREMISES is the primary residence of GIETZEN.

GIETZEN's North Carolina Department of Motor Vehicles lists the SUBJECT PREMISES as his

residence. As stated above, GIETZEN's sister advised that GIETZEN lived at the SUBJECT

PREMISES when she was interviewed in January of 2021. GIETZEN then had a law enforcement

encounter in July of 2021 in which he was less than a mile from the SUBJECT PREMISES. A

review of records from the U.S. Postal Service for the time period from November 10, 2021 to

December 9, 2021 related to the SUBJECT PREMISES showed mailed addressed to GIETZEN at

this address, along with mail to GIETZEN's brother and mother. Additionally, during two recent

instances of physical surveillance, GIETZEN was seen leaving the immediate area of the

SUBJECT PREMISES driving a blue 2001 Chevrolet Silverado, bearing N.C. license plate THM7072, VIN: 2GCEC19W111185207 (hereinafter "blue pick-up truck"). The first instance occurred on April 12, 2022 at approximately 5:15 pm. When surveillance was initiated at approximately 11:30 am, the blue pick-up truck was observed at the SUBJECT PREMISES. The second sighting of GIETZEN occurred on April 28, 2022 at approximately 4:30 pm. When surveillance was initiated on that day at approximately 9:30 am, the blue pick-up truck was again observed at the SUBJECT PREMISES. On both occasions, GIETZEN drove the blue pick-up truck to a gas station in the immediate vicinity of the SUBJECT PREMISES. Photographs of GIETZEN taken on April 12, 2022 are below in Exhibits 15A and 15B:

**Exhibit 15A**



**Exhibit 15B**



66.     The blue pick-up truck driven by GIEZEN on April 12, 2022 and April 28, 2022 had a North Carolina license plate registered to GIETZEN's brother at the SUBJECT PREMISES. Although this pick-up truck also has been observed at a residence located in Fuquay Varina, North Carolina, in the Eastern District of North Carolina, it is believed that location is not GIETZEN's primary residence for the reasons described above.  In addition to the two recent instances of surveillance in which agents saw GIETZEN in the blue pick-up truck, this pick-up truck has also been seen at the SUBJECT PREMISES on January 28, 2022, March 29, 2022, April 4, 2022, April 5, 2022, April 25, 2022, April 26, 2022 and April 27, 2022.  In addition to the blue pick-up truck and the 2006 Ford Focus, a third vehicle, a dark green color Saturn automobile (unknown year and model), bearing no license plate, has been observed at the SUBJECT PREMISES during surveillance on April 4, 2022, April 5, 2022, April 12, 2022, April 25, 2022, April 26, 2022, April 27, 2022, and April 28, 2022.

67.     I know based on my training and experience that people routinely re-wear clothing and accessories and store these items in their homes.  Clothing and accessories consistent with those worn by GIETZEN on January 6, 2021 (including a green jacket, jeans, knee pads, dark

shoes, white helmet and goggles) constitute evidence of his commission of the offenses discussed herein, in that GIETZEN can be visually identified as the individual in the videos discussed above, in part through the distinct attire and accessories he wore that day.

68.     Based on my training and experience and my conversations with other law enforcement officers involved in investigating the events at the U.S. Capitol on January 6, there is probable cause to believe that evidence of GIETZEN**'s** commission of the offenses discussed herein will be located in the SUBJECT PREMISES despite the approximately 16 months that have elapsed since January 6 as evidence continues to be recovered during searches of the residences of Capitol riots suspects.  I am aware that hundreds of people have been arrested in connection to the riot that occurred at the U.S. Capitol on January 6, 2021 and that in multiple jurisdictions, law enforcement continues to recover clothing, paraphernalia, tools, and devices that were worn, used or carried on January 6, 2021.  For example, in March 2022, agents conducted the search of a defendant's residence in the Southern District of Indiana and found what is believed to be the jacket the defendant wore when he entered the Capitol building on January 6, 2021.  Similarly, in April 2022, agents conducted a search of a defendant's residence in the Middle District of Alabama and found what are believed to be the clothing and gas mask the defendant wore to the U.S. Capitol on January 6, 2021.

69.     The SUBJECT PREMISES is likely to contain evidence of GIETZEN's presence at the U.S. Capitol on January 6, 2021.  For example, I would expect that the residence where GIETZEN lives would contain the items of clothing and accessories, he used that day.  I would also expect that, to the extent GIETZEN has physical records of travel to and from Washington, D.C.—such an itinerary, or other documents—those documents would also likely be in his residence.

### Facts Relating to the Electronic Devices

70.     As described above, GIETZEN sent a photograph of himself to a group text that included TIPSTER 2. The phone number used by GIETZEN was XXX-XXX-2041.[14] Records obtained from the phone carrier in August of 2021 showed the subscriber of this phone number to be GIETZEN at the SUBJECT PREMISES. No specific device was provided in the records but the International Mobile Equipment Identifier (IMEI) was identified as 358126072109011. For reference, the IMEI is a 15-digit unique identifier for a mobile device with cellular network capability. The Type Allocation Code, which is the first 8 digits of the IMEI, identifies the make and model of the device. For GIETZEN's cellular telephone, the IMEI indicates it is a Sony Xperia XA. It now appears phone number XXX-XXX-2041 is no longer associated with GIETZEN. However, based on significant telephone activity for phone number XXX-XXX-2041 on January 6, 2021 and the fact that a photograph of GIETZEN from that day was electronically transmitted via a group chat as described above, there is evidence that GIETZEN had in his possession at least one digital device (the device with IMEI 358126072109011, likely a Sony Xperia XA) while at the U.S. Capitol on January 6, 2021. In addition, based on photos and videos of the offenses on January 6, 2021, numerous persons committing the Target Offenses possessed digital devices that they used to record and post photos and videos of themselves and others committing those offenses. Further, based on the investigation, numerous persons committing the Target Offenses possessed digital devices to communicate with other individuals to plan their attendance at the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

---

[14] The complete phone number is known to the undersigned, but omitted here.

71.     Based on my training and experience, and on conversations I have had with other law enforcement officers, I know that some individuals who participate in activities aimed at disrupting or interfering with governmental and/or law enforcement operations have been known to use anonymizing services and/or applications capable of encrypting communications to protect their identity and communications. By using such tools, in some cases, the only way to see the content of these conversations is on the electronic device that had been used to send or receive the communications.

72.     The property to be seized includes the phone with IMEI 358126072109011 that utilized XXX-XXX-2041 and any alternate or successor mobile cellular telephones reasonably believed to be owned, used, or controlled by GIETZEN, or that GIETZEN had with him during his travel to or from, or presence in, Washington, D.C. (the "SUBJECT DEVICES").

73.     In my training and experience, individuals frequently post messages to social media sites such as Facebook and Facebook Messenger using a cellular telephone.  Furthermore, the cellular telephone may have location services that could show the location of GIETZEN on January 6, 2021, and his travels to and from Washington, D.C.  Finally, it is common for individuals to back up or preserve copies of digital media (such as photos and videos) across multiple devices to prevent loss.

74.     Any mobile cellular telephones located at the SUBJECT PREMISES belonging to GIETZEN are also likely to contain location information, including but not limited to geolocation data associated with photographs, which may identify a user's location during a specific time period relevant to the Target Offenses such as during the breach of the Capitol.

75.     Based on the foregoing, there is probable cause to believe that evidence related to the Target Offenses may be stored on the SUBJECT DEVICES.

## **CONCLUSION**

76.     I submit that this affidavit supports probable cause for warrants to search the SUBJECT PREMISES as described in Attachment A-1, and GIETZEN's person, including any bag or backpack carried with him, as described in Attachment A-2, and to seize the items described in Attachment B.

Respectfully submitted,

/s/ Craig W. Noyes
Craig W. Noyes
Special Agent
Federal Bureau of Investigation

In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this ___9___th day of May, 2022, at ___11:08___ a.m./p.m.

The Honorable Joi E. Peake
United States Magistrate Judge

45

## ATTACHMENT A-1

The property to be searched is all of the following (collectively, the "SUBJECT PREMISES"):
The property at 1023 Joe Matthews Road, Sanford, North Carolina 27332, which is a white single
family, one-story structure with dark shutters and concrete steps that led up to the front door, as
pictured below.





Authority to search extends to all parts of the SUBJECT PREMISES, including the main structure, garage(s), storage structures, outbuildings, and curtilage, and all containers, compartments, or safes located on the property, whether locked or not, and to the following vehicles if located at the SUBJECT PREMISES at the time of the execution of the warrant: a blue 2001 Chevrolet Silverado, bearing N.C. license plate THM7072, VIN: 2GCEC19W111185207, a 2006 Ford Focus, bearing N.C. license plate HEN8570, VIN: 1FAFP34N16W236942, and a dark green color Saturn (unknown year and model), bearing no license plate, whether locked or not, where the items described in Attachment B could be found.

**ATTACHMENT A-2**

Person to be searched

The Person to be searched is:

1.     The person of DAVID JOSEPH GIETZEN, wherever he is found, including any bag or backpack carried with him.  A photograph of GIETZEN is included below:



## ATTACHMENT B

*Property to be seized*

1.      Fruits, evidence, information, contraband, or instrumentalities relating to violations of 18 U.S.C. § 111(a)(1) & (b) (Assaulting, Resisting, or Impeding Certain Officers with Deadly or Dangerous Weapon), 18 U.S.C. § 231(a)(3) (Civil Disorder),  18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds), 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds), and 18 U.S.C. § 1752(a)(4) (Engaging in Physical Violence in a Restricted Building or Grounds) (the "Target Offenses") that have been committed by DAVID GIETZEN ("the Subject") and other identified and unidentified persons; in the form of:

   a.  Documents or other physical items concerning

      i.   unlawful entry into the U.S. Capitol, including any property of the U.S. Capitol;

      ii.  awareness of the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

      iii. efforts to disrupt the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

      iv.  the breach and unlawful entry of the United States Capitol, and any conspiracy or plan to do so, on January 6, 2021;

      v.   the riot and/or civil disorder at the United States Capitol on January 6, 2021;

      vi.  the assaults of federal officers/agents and efforts to impede such federal officers/agents in the performance of their duties the United States Capitol on January 6, 2021;

      vii. any conspiracy, planning, or preparation to commit those offenses;

      viii. efforts after the fact to conceal evidence of the Target Offenses, or to flee prosecution for the same;

      ix.  materials, devices, or tools that were used to unlawfully enter the U.S. Capitol by deceit or by force, including weapons and elements used to breach the building or to counter efforts by law-enforcement, such as pepper spray or smoke grenades;

49

x. communication devices, including closed circuit radios or walkie-talkies, that could have been used by co-conspirators to communicate during the unlawful entry into the U.S. Capitol;

xi. the state of mind of the Subject and/or other co-conspirators, e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation; and

xii. the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters relating to the criminal activity under investigation, including records that help reveal their whereabout

xiii. travel to or from Washington, D.C., within two months prior to or after January 6, 2021;

b. Clothing or other items worn or carried by GIETZEN on or around January 5, 2021 to January 7, 2021, or photographs or videos of the same, including the clothing depicted in these images:







c.  Clothing and other articles that reflect evidence of having participated in the unlawful activity at the U.S. Capitol, or photographs or videos of the same, including evidence of pepper spray or other non-lethal crowd control remnants.

d.  The cellular telephone with IMEI 358126072109011 that utilized XXX-XXX-2041 and any alternate or successor mobile cellular telephones reasonably believed to be owned, used, or controlled by GIETZEN, or that GIETZEN had with him during his travel to or from, or presence in, Washington, D.C.